**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

ANAIRY GARCIA RIVERA,

              Plaintiff,

v.

CAROLYN W. COLVIN,

              Defendant.

**DECISION & ORDER**
15-CV-6318

---

## Preliminary Statement

Plaintiff Anairy Garcia Rivera brings this action pursuant to Title II of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings. Docket ## 9, 16.

## Background and Procedural History

On August 7, 2012, plaintiff applied for disability insurance benefits. Administrative Record ("AR.") at 62, 109-10. The Social Security Administration denied plaintiff's application and she timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR. at 64-69. On November 5, 2013, a hearing was held before ALJ John Grenville W. Harrop, Jr. AR. at 27-48. On February 27, 2014, the ALJ issued a decision, therein determining

that claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. AR. at 9-21. On March 11, 2014, plaintiff filed a request for review of the ALJ's decision by the Appeals Council. AR. at 7-8. The Appeals Council declined to review the ALJ's decision, making it the final decision of the defendant Commissioner. AR. at 1—3. This federal lawsuit followed.

## Medical History

In her disability application, plaintiff reported "[n]eck pain, headaches, anxiety, depression, and blackouts" that limited her ability to work. AR. at 125. These impairments, she alleged, became disabling on April 15, 2011 following an automobile accident. AR. at 121, 388. According to plaintiff's medical records, she was rear-ended while driving and went to the Emergency Department of Sisters of Charity Hospital. AR. at 388. Her records indicate that she injured her neck, upper back, and wrists in the accident. AR. at 392. Plaintiff appeared otherwise normal at the hospital and was discharged with a Motrin prescription. AR. at 389.

On April 18, 2011, plaintiff visited Jericho Road Family Practice. AR. at 473. Plaintiff complained of pain in her neck, upper spine, and shoulders. Id. On examination, nurse practitioner Leonard observed a limited range of motion in plaintiff's neck and shoulders. Id. Plaintiff visited the Jericho Road Family Practice twelve more times during the relevant time period. AR. at 434-52,

2

459-72. At these appointments, plaintiff complained of neck and back pain, and treatment notes indicate that she had a limited range of motion in her neck, spine, and shoulders accompanied by pain and discomfort. Id. Treatment notes also indicate that plaintiff complained of headaches, depression, anxiety, acid reflux, and vertigo. AR. at 437-38, 448-49, 461-62, 468-69.

On April 20, 2011, plaintiff went to Erie County Chiropractic for pain related to her automobile accident. AR. at 310. She attended approximately 100 chiropractic appointments with Scott Croce, D.C., between April 20, 2011 and February 1, 2012. AR. at 250-311. At these appointments, plaintiff reported muscle soreness; severe pain and tingling in her neck, back, arms, and legs; and swollen ankles. Id.

On April 25, 2011, plaintiff saw Dr. Graham Huckell, M.D., for pain in her right hip and tingling in her arms and legs. AR. at 192. Plaintiff described the pain as sharp and rated it a seven out of ten in severity. Id. Plaintiff also reported a history of acid reflux, anxiety, asthma, and depression. Id. On examination, Dr. Huckell observed that plaintiff appeared largely unremarkable except for limited musculoskeletal abduction and rotation. AR. at 193. An x-ray of her right hip revealed no abnormalities or degenerative changes. AR. at 194. Dr. Huckell recommended that plaintiff be evaluated for her spine, but noted that she was able to participate in regular activity with respect to her right hip. Id.

3

On May 7, 2011, plaintiff's chiropractor referred her to ProScan Imaging Buffalo for an MRI of her spine. AR. at 395-96. Based on the MRI, Dr. Gurmeet Dhillon, M.D., concluded that plaintiff had "[c]oncentric bulging of the disc at the L5-S1 level in the lumbar without evidence of lumbar disc herniation or conus or cauda equine compression." Id. Dr. Dhillon also determined that she had a "[s]mall central sub-ligamentous C5-6 disc herniation indenting the anterior aspect of the thecal sac" and "[c]oncentric bulging of the disc and annular tears involving the C4-5 level with no other sites of cervical disc herniation, cervical spinal stenosis, or cervical cord compression." AR. at 396.

On May 9, 2011, plaintiff saw Dr. Mikhail Strutsovskiy, M.D., at RES Physical Medicine & Rehab Services for pain in her cervical, thoracic, and lumbar spine; pain in her wrists; headaches; and insomnia. AR. at 397. Plaintiff reported constant pain ranging from a seven to ten out of ten in severity that was aggravated by walking, standing, or sitting for ten minutes or more. Id. On examination, plaintiff appeared in distress due to her pain but was otherwise alert and oriented. AR. at 398. Her physical examination revealed few abnormalities beyond decreased range of motion in her spine. AR. at 398-99. Dr. Strutsovskiy noted that plaintiff had difficulty with squatting and toe-to-heel walking due to her neck and back pain. Id. He determined that plaintiff's car accident led to whiplash strain in her cervical spine, bilateral carpel tunnel,

spinal pain, occipital neuralgia, cervicocranial syndrome, sacroiliitis, and soft tissue injury with myofascial pain syndrome. AR. at 399. He also reviewed the results of plaintiff's MRI and determined that she had disc bulges at the L4-L5 and L5-S1 levels and a C6-7 disc herniation with extrusion. AR. at 400.

On May 23, 2011, plaintiff returned to Dr. Strutsovskiy, who found her largely the same. AR. at 401-02. Dr. Strutsovskiy prescribed her Baclofen and bio-freeze to apply to the affected area. AR. at 402.

On June 8, 2011, plaintiff saw Dr. Marc Tetro, M.D., at the request of her chiropractor. AR. at 196. She presented with bilateral hand numbness and pain with secondary shoulder pain. Id. Dr. Tetro noted that, following her accident, "[i]t ha[d] become clearly apparent that in addition to her rather significant cervical spine injury that she ha[d] numbness and tingling in both hands which [wa]s strongly suggestive of carpal tunnel syndrome." Id. Plaintiff indicated that she frequently woke up from sleep due to the tingling and would drop objects that she was holding. Id. Plaintiff also reported bilateral shoulder pain in her trapezius and scapula, which was worsened by reaching overhead. Id. On examination, plaintiff appeared relatively healthy, alert, and oriented, but had limited range of motion in her cervical spine. AR. at 197. Dr. Tetro observed tenderness in her trapezius, scapula, and rotator cuff insertions, and radiating pain in her shoulder and

5

arms. Id. X-rays, however, revealed that her shoulders were "essentially within normal limits . . . ." Id. Dr. Tetro found that plaintiff suffered from bilateral carpal tunnel syndrome; bilateral hand post-traumatic diffuse digital flexor tenosynovitis; bilateral index, middle, and ring finger stenosing flexor tenosynovitis; and mild bilateral shoulder rotator cuff tendonitis with mild AC joint arthrosis. AR. at 198. He recommended upper extremity electrodiagnostic studies, wrist splints, and anti-inflammatories, with the possibility of future corticosteroid injections or surgery. AR. at 199.

On July 11, 2011, plaintiff saw Dr. Cameron Huckell, M.D., at the request of her chiropractor. AR. at 202. Plaintiff complained of disabling neck and lower back pain exacerbated by prolonged sitting. AR. at 202-03. She rated the pain seven to ten out of ten in severity, and noted that it was often accompanied by intermittent numbness and paresthesia in her limbs and mild to severe headaches. Id. On examination, plaintiff had a decreased range of motion in her cervical spine. AR. at 204. Dr. Huckell concluded that plaintiff "sustained significant injuries to [her] spine as a result of the motor vehicle accident," including concentric bulging of the C4-5 level in her cervical spine with associated annular tear, a small central sub-ligamentous C5-6 disc herniation, and concentric bulging of the L5-S1 level in the lumbar spine. AR. at 205. Dr. Huckell recommended chiropractic care, massage, and pain management

6

with surgery reserved as a last resort. Id. Dr. Huckell also concluded that, at the time of the appointment, plaintiff was disabled. Id.

On July 22, 2011, plaintiff saw Dr. Strutsovskiy for a follow-up appointment. AR. at 404. Dr. Strutsovskiy noted that she had pain in her cervical and lumbar spine and her trapezius, and prescribed her Lortab and Diazepam. AR. at 405. On August 18, 2011, plaintiff returned to Dr. Strutsovskiy. AR. at 406. She reported that her cortical regimen and chiropractic care had somewhat helped with her condition. Id. During the physical examination, plaintiff had pain in her cervical and lumbar spine, her scapula, her upper trapezius, and her posterior sacrospinous ligament over her sacroiliac joints. Id.

On September 8, 2011, plaintiff saw Dr. Strutsovskiy again. AR. at 408. Dr. Strutsovskiy observed that she had continued pain in her neck and back and refilled plaintiff's prescription. AR. at 409. Dr. Strutsovskiy also discussed with plaintiff the possibility of surgery. Id. Plaintiff returned to Dr. Strutsovskiy on September 29, 2011, describing her pain as five and a half out of ten in severity and said that her medication "provide[d] her stable relief." AR. at 410.

On October 24, 2011, Dr. Renee Baskin, Ph.D., provided a consultative evaluation of plaintiff's psychiatric health at the request of the Division of Disability Determination. AR. at 207-13.

7

Plaintiff reported that she was hospitalized in October 2006 for depression, anxiety, and panic attacks. AR. at 207. She enrolled in counseling for several years but stopped in 2010. Id. Due to pain and anxiety, plaintiff reported difficulty falling and staying asleep. AR. at 208. She also reported "dysphoric moods, crying spells, feelings of hopelessness, loss of usual interests, irritability, fatigue/loss of energy, social withdrawal and thought of death or suicide . . . ." Id. Relatedly, plaintiff reported anxiety that included obsessive scratching, panic attacks, difficulty breathing, trembling, and dizziness. Id. Plaintiff said that the panic attacks occurred randomly, and Dr. Baskin noted that "[i]t appear[ed] that [plaintiff was] in an almost constant state of anxiety." Id. Plaintiff also claimed to have difficulty concentrating and reported short-term memory loss. Id.

During plaintiff's mental examination, Dr. Baskin found plaintiff responsive, cooperative, and adequately sociable. Id. She looked and behaved appropriately and spoke clearly and fluently. AR. at 208-09. Dr. Baskin observed that plaintiff's thought processes were coherent; her affect was appropriate; and her overall mood was pleasant, polite, personable, and easily engaged. AR. at 209. Dr. Baskin found that plaintiff's attention and concentration were intact: she completed counting, simple calculations, and serial threes slowly but successfully. Id. Similarly, Dr. Baskin observed that plaintiff's recent and remote memory skills were intact and

8

her insight and judgment were fair, but found that she functioned at a below-average range intellectually. Id.

Plaintiff told Dr. Baskin that she was capable of completing her activities of daily living, but rarely did so because of her injuries. AR. at 210. Plaintiff said that she dressed, bathed, groomed herself, and managed her money, but received some help from her family. Id. Plaintiff told Dr. Baskin that she experienced significant social withdrawal and primarily socialized with her family. Id. Plaintiff said she often spent time watching television and listening to the radio alone, but liked going out to eat. Id. Dr. Baskin diagnosed plaintiff with depressive disorder, anxiety disorder, pain disorder associated with her general medical condition, acid reflux, spinal bulging and disc herniation, cervical disc herniation, and asthma. Accordingly, her medical source statement provided that,

> [w]ith regard to the vocational functional capacities of [plaintiff], she would have minimal to no limitations being able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions and relate adequately with others. Medical/physical problems may interfere with her ability to maintain a regular schedule. . . . The results of the examination appear to be consistent with stress-related and psychiatric problems and this may interfere with [plaintiff's] ability to function on a daily basis. [Plaintiff] also appears to be compromised by lack of involvement in any type of consistent therapy.

Id. Dr. Baskin recommended that plaintiff seek psychological or psychiatric treatment and consider vocational training or rehabilitation. Id. Finally, Dr. Baskin remarked that plaintiff's prognosis was fair to good given her age and opportunities for improvement. Id.

On October 24, 2011, Dr. Gautam Arora, M.D., conducted an internal medicine examination of plaintiff at the request of the Division of Disability Determination. AR. at 213. Plaintiff complained chiefly of neck and back pain. Id. She described the pain in her neck as sharp and aching, accompanied by a tingling sensation and numbness in her extremities. Id. She said that her back pain was worse and prevented her from working more than ten minutes at a time. Id. Plaintiff also reported long-term anxiety and depression, which she claimed led to compulsive scratching and panic attacks. Id. Plaintiff noted a history of asthma attacks that occurred once or twice per year. Id. Plaintiff said that she cooked and occasionally cleaned, did laundry, and shopped. AR. at 214. She reported smoking five to six cigarettes a day and drinking socially. Id. She also claimed to shower, bath, and dress herself, watch television, listen to the radio, and go out to eat. Id.

On examination, Dr. Arora noted that plaintiff had a normal gait and stance. Id. She appeared largely unremarkable except for a reduced range of motion in the spine. AR. at 214-15. Dr. Arora diagnosed plaintiff with cervical degenerative disc

disease/cervical spondylosis, lumbar spondylosis/myofascial back pain, anxiety, depression, and asthma. AR. at 215. Dr. Arora described plaintiff's prognosis as fair and provided the following medical source statement: "The claimant has mild limitation of carrying, lifting, walking long distance and standing for a prolonged period of time secondary to lumbar spondylosis. The claimant should avoid dust, smoke, and known respiratory irritants secondary to asthma." AR. at 216.

Dr. H. Tzetzo, a state agency psychiatrist, submitted a psychiatric review technique of plaintiff on November 1, 2011. AR. at 218. Dr. Tzetzo reviewed plaintiff's medical record and determined that she suffered from depression, anxiety disorder, and an addiction disorder related to marijuana use. AR. at 218-26. Dr. Tzetzo concluded that her disorders imposed only mild restrictions on activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. AR. at 228. Accordingly, Dr. Tzetzo determined that plaintiff should be able to psychiatrically cope with normal work pressures. AR. at 230.

On November 3, 2011, plaintiff saw Dr. Strutsovskiy. AR. at 232. Plaintiff claimed that her medication helped her but reported increased anxiety and insomnia. Id. On examination, Dr. Strutsovskiy noted pain in plaintiff's neck and back. Id. In addition, he found that plaintiff suffered from posttraumatic stress

11

disorder and anxiety related to her car accident. AR. at 233. Dr. Strutsovskiy refilled plaintiff's Lortab and Diazepam prescription and prescribed her Zyprexa for her anxiety. Id.

On December 1, 2011, plaintiff returned to Dr. Strutsovskiy complaining of pain in her spine and wrists, increased anxiety, and insomnia. AR. at 237. Dr. Strutsovskiy refilled plaintiff's Lortab and Diazepam prescription, but replaced her Zyprexa prescription with one for Seroquel. AR. at 238. Plaintiff saw Dr. Strutsovskiy again on December 29, 2011, and Dr. Strutsovskiy observed continued back, neck, and wrist pain. AR. at 243.

Starting on March 7, 2012, plaintiff received treatment at Buffalo Neurosurgery Group from Dr. P. Jeffrey Lewis, M.D. AR. at 331. Plaintiff complained of daily headaches, dizziness, sensitivity to light, neck pain, shoulder pain, back pain, numbness and tingling in her extremities, and facial pain. Id. Plaintiff told Dr. Lewis that she was unable to live with the chronic pain. Id. On examination, Dr. Lewis observed restricted range of motion in the cervical spine accompanied by paravertebral muscle spasms. Id. Based on his examination, Dr. Lewis concluded that plaintiff had an annular tear injury. Id. He determined that her cervical spine injury left her "very disabled," and recommended a cervical discogram at C3-4, C4-5, and C5-6 to determine if she was a candidate for spinal surgery. AR. at 332.

On June 13, 2012, plaintiff returned to Dr. Lewis. AR. at 333.

At the appointment, Dr. Lewis noted that plaintiff continued to smoke cigarettes "fairly heavily," and had little success with any of her other treatments. Id. On July 31, 2012, plaintiff had a discogram taken, revealing mild straightening of the cervical spine and minimal disc space narrowing at the C5-6 level. AR. at 335. At the C3-4 and C4-5 levels, the imaging revealed "full thickness anterior and bilateral posterolateral annular tears," and possible "mild disc bulges in the posterolateral regions." AR. at 337.

Plaintiff returned to Dr. Lewis on August 10, 2012. AR. at 341. Based on the discogram, Dr. Lewis recommended surgery - "an anterior cervical microdiscectomy and fusion with PEEK interbody fusion cages at C3-4 and C4-5, bone extender and anterior plate" - to correct her herniation, annular tears, and spinal instability Id. On September 11, 2012, Dr. Lewis performed the microdiscectomy and PEEK interbody fusion on plaintiff. AR. at 364. Id. A post-operative evaluation revealed that plaintiff had less pain in her arms. AR. at 362.

On September 19, 2012, Dr. Baskin provided an additional psychiatric evaluation of plaintiff. AR. at 343. Plaintiff reported difficulty falling and staying asleep and a decreased appetite. AR. at 344. Plaintiff explained that "coping with chronic pain, significant limitations, and financial stress" led to her depression and anxiety. Id. She reportedly experienced "dysphoric moods, crying spells, loss of usual interests,

irritability, fatigue/loss of energy, social withdrawal, excessive apprehension and worry." Plaintiff described feeling unmotivated and disinterested, and experiencing mood swings. Id.

During the mental status examination, plaintiff was cooperative and responsive. Id. She wore sunglasses due to light sensitivity. AR. at 345. She spoke clearly and expressively and had goal-directed, coherent thoughts. Id. Dr. Baskin noted, though, that her attention and concentration were mildly impaired because of her pain. Id. Her recent and remote memory skills were similarly impaired. Id. Intellectually, she was functioning at a low to below-average range, but had fair insight and judgment. Id.

Plaintiff told Dr. Baskin that she completed activities of daily living with difficulty because of her limitations sitting, standing, lifting, bending, walking, and climbing. Id. She dressed, bathed, and groomed herself, but occasionally needed help from her family. AR. at 346. She reported minimal socializing, and said that she mostly watched television, listened to the radio, and read. AR. at 346.

Based on her examination of plaintiff, Dr. Baskin determined that,

> [w]ith regard to the vocational functional capacities of [plaintiff], she would have minimal to no limitations being able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions and relate

14

> adequately with others.  Medical/physical problems may
> interfere with [plaintiff's] vocational functional
> capacities. . . . She would have moderate limitations
> being able to deal with stress.

Id.  Dr. Baskin diagnosed plaintiff with adjustment disorder with
mixed anxiety and depressed mood, pain disorder associated with
general medical condition, status post cervical fusion surgery,
chronic neck and back pain, and asthma.  Id.  Dr. Baskin then opined
that plaintiff should seek psychological or psychiatric treatment
and consider rehabilitation or vocational training.  Id.  If
plaintiff got supportive mental health treatment, Dr. Baskin
reasoned that her prognosis would be fair.  Id.

Dr. Nikita Dave, M.D., performed a consultative internal
medicine examination at the request of the Division of Disability
Determination on September 19, 2012.  AR. at 348.  Plaintiff
reported constant pain in her upper back that she described as aching,
stabbing, and radiating.  Id.  She reported increased pain after
prolonged sitting or standing, and noted that it helped when she
sat down, reclined, and put ice or heat on the painful areas.  Id.
Plaintiff also reported lower back pain that she described as
constant and stabbing.  Id.  She claimed that it caused spasms,
numbness, and tingling in her legs, and said that "prolonged sitting,
standing, walking, physical activity, and cleaning" exacerbated the
pain.  Id.  Plaintiff reported "N/A" when asked to describe her
activities of daily living.  AR. at 349.  She also reported that she

had recently quit smoking.  Id.

During the physical examination, Dr. Dave noted that plaintiff was in no acute distress.  Id.  She appeared unremarkable except for her musculoskeletal limitations: she had a limited range of motion in her cervical and lumbar spine and tenderness in both areas.  AR. at 350.  She also had slightly declined strength in her upper and lower extremities, possibly due to her pain.  Id.  Based on the above, Dr. Dave diagnosed plaintiff with asthma, neck pain, status post cervical spine fusion, lower back and bilateral lower extremity pain, and an "inconsistent sensory exam."  AR. at 351.  Dr. Dave opined that plaintiff was very limited due to her cervical spine operation and would "definitely have moderate to marked limitations for all motions through the cervical spine, lifting, carrying, pushing, and pulling."  Id.  Dr. Dave was unable to assess the limitations in her lumbar spine because of the surgery and plaintiff's "limited participation."  Id.  Dr. Dave also advised plaintiff to avoid smoke, dust, fumes, inhalants, chemicals, and allergens.  Id.

On October 4, 2012, Dr. M. Totin, a state agency psychologist, filled out a psychiatric review technique form for plaintiff.  AR. at 366.  Based on a review of the record, Dr. Totin found that plaintiff had an adjustment disorder with mixed anxiety and depression.  AR. at 366-75.  Dr. Totin noted that plaintiff had mild restriction of activities of daily living; mild difficulties in

16

maintaining concentration, persistence, or pace; and one or two repeated episodes of deterioration of extended duration. AR. at 376. Accordingly, Dr. Totin determined that plaintiff could work a simple, low-stress job. AR. at 378.

On November 19, 2012 plaintiff saw Dr. Lewis for a post-operative appointment. AR. at 415. Dr. Lewis noted that plaintiff still had "some intrascapular muscles spasms that cause[d] trapezius pain and headaches of the posterior muscles." Id. Dr. Lewis also observed good range of motion laterally, but decreased flexion extension. Id.

Plaintiff attended physical therapy on January 9, 2013, where she complained of pain that limited her ability to stand and walk. AR. at 418. On February 4, 2013, plaintiff was discharged from physical therapy due to worsening pain in her neck. AR. at 420.

On February 27, 2013, plaintiff saw Dr. Lewis for increased pain. AR. at 421. He noted that she did not attend physical therapy "due apparently to transportation issues." Id. Plaintiff saw Dr. Lewis again on June 12, 2013 for ongoing neck and lower back pain and leg cramping. AR. at 423. She also told Dr. Lewis that she started smoking again. Id. Dr. Lewis ordered plaintiff to have a cervical x-ray and MRI taken. AR. at 424.

On August 14, 2013, plaintiff saw Dr. Lewis again, complaining of severe and recurring pain. AR. at 429. Dr. Lewis ordered a CT scan to evaluate her spine, and noted that she had mild degenerative

disc disease at L5-S1 in her lumbar spine.  AR. at 430.  On September 18, 2013, Plaintiff returned to Dr. Lewis, who opined that she likely suffered from pseudoarthrosis.  AR. at 432.  Dr. Lewis noted that plaintiff's pain left her in tears, and recommended an additional spinal surgery at the C3-C5 level.  Id.

On October 28, 2013, plaintiff visited Dr. Anthony M. Leone, M.D.  AR. at 480.  Dr. Leone opined that plaintiff had surgery without properly attempting more conservative treatment.  Id. Plaintiff reported that her headaches had somewhat improved since her surgery, but that her neck, arm, and shoulder pain persisted. Id.  She told Dr. Leone she was currently taking Percocet but it was unhelpful.  Id.  Plaintiff said that reaching overhead and looking up, down, and side-to-side made the pain worse.  Id.  On examination, Dr. Leone described her as "healthy-appearing" and capable of standing and walking without difficulty.  AR. at 481.  Dr. Leone also reviewed a CT scan of plaintiff's spine, noting that it appeared stable.  Id.

Dr. Leone opined that plaintiff had an abnormal disc at the C5-6 level, which her surgery failed to address.  Id.  Plaintiff's original operation, he continued, was not "even remotely reasonable or necessary," given how little conservative treatment she attempted.  Id.  Based on the results of plaintiff's MRI and discogram, Dr. Leone concluded that "it [was] very unlikely that surgery was a necessity," and that it left plaintiff in a state of

chronic pain and discomfort.   Id.   Dr. Leone recommended further MRI scans and pain management.   Id.

On December 12, 2013, plaintiff returned to Dr. Leone.   AR. at 483.   Plaintiff complained of continued muscle spasms in her neck and back, and pain in her shoulders and arms.   Id.   She also told Dr. Leone that she was seeking a second opinion after Dr. Lewis recommended another surgery.   Id.   Based on the results of her MRI, Dr. Leone diagnosed plaintiff with cervical degenerative disc disease, cervical disc herniation, cervicalgia, and cervical radiculitis.   Id.   He remarked that surgery would be reasonable, but that plaintiff seemed uninterested.   Id.   Accordingly, he referred plaintiff to a pain management specialist and told her to return if she reconsidered surgery.   Id.   However, in a letter dated January 16, 2014, Dr. Leone remarked that further surgery would be unwarranted and noted that the original surgery only hurt plaintiff. AR. at 482.   Dr. Leone concluded that plaintiff should continue with conservative treatment and described her as "currently disabled from attending school."   Id.

### Hearing Testimony

Testimony of Plaintiff: On November 5, 2013, plaintiff appeared before ALJ Grenville W. Harrop, Jr. with her representative, Keith Herald.   AR. at 27-48.   Plaintiff testified that she was twenty-six years old, a high school graduate, single, and living with her

19

nine-year-old son.  AR. at 30.  She said that she had been unemployed since April 15, 2011 and relied on food stamps, Medicaid, and assistance from Buffalo Municipal Housing Authority to support herself.  Id.  Plaintiff testified that she briefly earned income after April 15, 2011 by preparing and selling pre-made meals, but had to stop because of her back pain.  AR. at 30-31.

Plaintiff testified that she worked as a teacher's aide at a daycare up until April 2011.  AR. at 31.  Before that, from September to December 2010, she worked as an overnight stocker.  Id.  Plaintiff also worked as a market research specialist at a call center from September 2009 to March 2010, and as an overnight customer service specialist from July 2008 to October 2008.  Id.  Plaintiff testified that these positions required her to mostly sit but occasionally stand.  AR. at 31-32.  From November 2008 to February 2009, plaintiff said she worked as a cashier, which was a standing-only position. AR. at 32.  Plaintiff contributed her difficulty maintaining employment to her son's health and behavioral problems.  AR. at 32.

Plaintiff next testified that, on April 15, 2011, she was in a car accident that injured her back and neck.  AR. at 33.  She testified that she underwent surgery and attempted physical therapy but had to stop due to pain.  Id.  Plaintiff testified that she had a second surgery scheduled for January 6, 2014 with Dr. Lewis, but was unsure whether she would go through with the procedure.  AR. at 34.  Plaintiff stated that she experienced a great deal of pain,

including headaches, shoulder pain, neck pain, numbness and tingling in her extremities, leg pain, and generalized pain all over her body. AR. at 34-35.  Plaintiff also testified that she experienced intense hand cramps that prevented her from taking care of herself and her child, and leg cramps that forced her to lie down for several hours a day.  AR. at 35.

Plaintiff testified that she routinely picked her son up from school and drove to her college classes.  Id.  She enrolled in school in September 2013 and was taking four courses that met Monday through Friday.  AR. at 36-37.  Plaintiff stated that her pain had impacted her performance at school – with her grades falling from A's to B's and C's - and that she had difficulty writing for long periods of time.  AR. at 41-43.

Plaintiff also testified that she cooked, but sometimes required the help of her mother and niece.  Id.  During the course of an eight-hour day, plaintiff testified that she lay down frequently, sometimes for hours at a time.  AR. at 42-43.  She said she was unable to clean or do laundry, and required significant help grocery shopping.  AR. at 38.  According to her testimony, plaintiff was unable to lift more than five pounds and often required help carrying things.  AR. at 39.  Plaintiff also testified that she could only sit for ten to twenty minutes, stand for twenty to twenty-five

minutes, and walk for five to ten minutes before experiencing pain.[1]
AR. at 38-39. As a result of her health issues, plaintiff testified
that she experienced mood swings; crying spells; and feelings of
worthlessness, uselessness, and listlessness. AR. at 39-40.

Finally, plaintiff testified to taking medication for her pain
and anxiety. AR. at 41. She said that her pain medication was
unhelpful, but that her anti-anxiety medication helped somewhat.
Id. More recently, though, her anxiety had been "out of control,"
leading to frequent panic attacks, fatigue, and difficulty
breathing. AR. at 41-42.

Testimony of the Vocational Expert: Vocational Expert ("VE")
Jay Steinbrenner also testified at the hearing. AR. at 43. VE
Steinbrenner described plaintiff's previous employment as: daycare
worker (semi-skilled, specific vocational preparation ("SVP") of
4, light work, Dictionary of Occupational Titles ("DOT") number
359.677-019); overnight store clerk (semi-skilled, SVP of 4, heavy
work, DOT number 299.367-014); customer service appointment clerk
(semi-skilled, SVP of 3, sedentary work, DOT number 237.367-010);
sales attendant (unskilled, SVP of 2, light work, DOT number
299.677-010); and retail sales clerk (semi-skilled, SVP of 3, light
work, DOT number 290.477-014). AR. at 44-45.

Next, the ALJ asked VE Steinbrenner to consider what available

---

[1] Plaintiff's representative noted that plaintiff stood up and walked
around multiple times during the hearing. AR. at 41.

employment opportunities existed for an individual: (1) of the same age and with the same educational and employment history as plaintiff; (2) who had degenerative disc disease, status post cervical fusion with chronic neck and back pain, asthma, and an adjustment disorder with anxiety and depression; and (3) who had a residual functional capacity for sedentary to light work "with a sit/stand option." AR. at 45. VE Steinbrenner replied that such an individual could work as an appointment clerk or a daycare worker. Id. VE Steinbrenner also said that such an individual could work as a telephone marketer or solicitor (DOT number 299.357-014, low semi-skilled, SVP of 2 or 3, sedentary work, with 258,060 jobs nationally and 928 in western New York), a telephone survey worker (DOT number 205.367-054, unskilled, SVP of 2, sedentary work, 200,150 jobs nationally and 1,317 in western New York), or a telephone or switchboard operator (DOT number 235.662-022, low semi-skilled work, SVP of 3, sedentary work, 147,570 jobs nationally and 815 in western New York). AR. at 46. When asked if this individual could only sit for ten minutes at a time and would have to lie down for at least two hours a day, VE Steinbrenner testified that no employment opportunities would exist for them. AR. at 47.

At the end of the hearing, plaintiff's representative noted that this was plaintiff's second application for disability and requested that her prior application be reopened. Id.

23

## Determining Disability Under the Social Security Act

The Evaluation Process:  The Social Security Act provides that a claimant will be deemed to be disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.

24

> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265–66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas:

25

"(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 15, 2011, the alleged onset date of her disability. AR. at 14. At the second step, the ALJ found that

26

plaintiff had the following severe impairment: status post cervical microdiscectomy and fusion with alleged continuing pain. AR. at 14-16. The ALJ noted that plaintiff's lower back problems, asthma, and anxiety, though perhaps impairments, did not present the required objective diagnostic evidence to qualify as severe impairments under the regulations. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which rendered her disabled. AR. at 16. Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the residual functional capacity ("RFC") to perform her past work, notwithstanding her severe impairments. The ALJ concluded that plaintiff had the RFC to perform a full range of sedentary work with a sit/stand option. AR. at 16-19. Based on that, the ALJ determined that plaintiff could not perform any of her past relevant work. AR. at 20.

Because plaintiff was unable to perform her past work, the ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering her physical ability, age, education, and previous work experience. AR at 10-21. The ALJ next determined whether jobs existed in the national economy that a person having plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). After considering all of the evidence on record, the ALJ found that jobs existed "in significant

numbers in the national economy" that plaintiff could perform, including telephone marketer, telephone operator, and telephone survey worker. AR. at 20-21.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted).

This deferential standard of review does not mean, however,

that the Court should simply "rubber stamp" the Commissioner's determination.  Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").  While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).  Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made

according to the correct legal principles." Johnson v. Bowen, 817
F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on two grounds,
alleging that: (1) the ALJ erred in rejecting the opinions of Dr.
Leone and Dr. Lewis in his RFC determination; and (2) the ALJ erred
in rejecting Dr. Totin's opinion in his step two analysis. See
Plaintiff's Memorandum (Docket # 9-1) at 7-14.

In support of her first point, plaintiff notes that both Dr.
Lewis and Dr. Leone observed, among other things, plaintiff's
abnormal spinal health at the C3-4, C4-5, and C5-6 levels and limited
range of motion in her spine. Id. at 8. By failing to explain his
process for assigning weight to these opinions, plaintiff argues
that the ALJ committed reversible error. Id. at 11. With regard
to her second point, plaintiff argues that the ALJ improperly weighed
Dr. Totin's opinion when he determined that plaintiff's anxiety was
a non-severe impairment at step two. Id. at 12-13. The ALJ
erroneously gave Dr. Totin's opinion no weight, plaintiff contends,
because he mistakenly believed that Dr. Totin considered medical
evidence from before the disability onset date. Id. at 12-13.
Relatedly, plaintiff argues that the ALJ failed to properly credit
the opinion of Dr. Baskin, which plaintiff believes qualifies her
to meet the listing for depressive effective disorders. Id. at 13.

1. Opinions of Treating Physicians: Plaintiff first contends
that ALJ Harrop improperly discredited the opinions of Dr. Lewis
and Dr. Leone without providing sufficient explanation. Based on
the ALJ's opinion and the record as a whole, I agree.

Under the "treating physician rule," the ALJ must afford "a
measure of deference to the medical opinion of a claimant's treating
physician." See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004);
20 C.F.R. § 404.1527(d)(2). Accordingly, the opinion of a
claimant's treating physician as to the nature and severity of the
impairment is given "controlling weight," so long as it "is
well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] case record." Burgess v. Astrue, 537
F.3d 117, 128 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2));
see also, Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003);
Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).

Relatedly, the Social Security Administration is required to
explain the weight it gives to the opinions of treating physicians.
20 C.F.R. § 404.1527(d)(2) ("[W]e will always give good reasons in
our notice of determination or decision for the weight we give your
treating source's opinion."). This is true even when the treating
source's opinion is given controlling weight, but especially true
if the opinion is not given controlling weight. See Burgess, 537
F.3d at 129. The ALJ must consider, inter alia, the "[l]ength of

the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Id (internal quotations omitted) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). "After considering the above factors, the ALJ must comprehensively set forth [their] reasons for the weight assigned to a treating physician's opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d. Cir. 2015) (citing Burgess, 537 F.3d at 129). The failure to provide "good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

Here, the ALJ said that he gave Dr. Lewis' and Dr. Leone's opinions that plaintiff was "very disabled" and "disabled", respectively, "no weight." AR. at 18, 19. As the Commissioner correctly notes, see Commissioner's Memorandum (Docket # 16-1) at 15-16, the ALJ need not accept a determination from a treating physician as to the ultimate issue of whether plaintiff is disabled or not. Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999). However, a

treating physician's opinion as to the "nature and severity" of plaintiff's conditions, far from the ultimate issue, is exactly what a treating physician should be speaking to. See Green-Younger v. Barnhart, 335 F.3d at 106 (finding that the treating physician was offering an opinion on the "nature and severity" of plaintiff's impairment when he discussed her ability to function, sit or stand continuously and her need for rest periods); see also Rosa v. Callahan, 168 F.3d.72, 79 (2d Cir. 1999)("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (internal citations removed)). A treating physician's opinion as to whether their patient is disabled from work does not ordinarily spring from thin air. It is typically based on objective medical facts developed by the physician during the course of treatment for an illness or medical issue.   Thus,

> courts have often repeatedly cautioned SSA adjudicators that this [ultimate issue] guideline must be considered in conjunction with the regulatory mandate that a treating source's opinion on the issue of the nature and severity of the claimant's impairments must be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 1-6 (2d Cir.2003). Indeed, SSR 96-5p expressly reminds adjudicators that, "[i]n evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d)." 1996 WL 374183, at *3. In other words, the fact that a treating physician reports the patient's medical condition as "disabled," or a "disability," does not by itself disqualify the report from the requirements of the treating physician regulations.

Delk v. Astrue, No. 07-CV-167, 2009 WL 656319, at *7 (W.D.N.Y. 2009).

The AlJ's decision to assign "no weight" to Dr. Lewis' opinions is particularly troubling here because: (1) Dr. Lewis examined plaintiff ten times throughout her alleged disability period;[2] and (2) the ALJ relied singularly on Dr. Arora - a consultative examiner who plaintiff saw once in October 2011 before her spinal surgery - for medical opinion evidence to determine her physical RFC.[3]  AR. at 18-19.   Relying on the one-off, years-old opinion of a consultative examiner to determine plaintiff's physical RFC - especially when there was a treating physician who had seen plaintiff ten times over the course of a year - strikes this Court as a derogation of the ALJ's duty.  See Cadet v. Colvin, -- F.Supp.3d --, No. 13-CV-6450, 2015 WL 4038551, at *3 (W.D.N.Y. Aug. 17, 2015) ("As such, where a record contains no formal RFC assessments from a treating physician, and does not otherwise contain sufficient evidence . .

---

[2] On March 7, 2012, Dr. Lewis first described plaintiff as "very disabled by her cervical spine." AR. at 331-32. Dr. Lewis then saw plaintiff on nine separate occasions, including several post-operative appointments: June 13, 2012, AR. at 333-34; August 10, 2012, AR. at 341; September 11, 2012, AR. at 362; November 19, 2012, AR. at 415; February 27, 2013, AR. at 421; June 12, 2013, AR. at 423; August 14, 2013, AR. at 429; and September 18, 2013, AR. at 432.

[3] The ALJ assigned the opinion of consultative examiner Dr. Nikita Dave "very little if any weight" because "the recent surgery the claimant had undergone made it obvious she was for the moment quite limited." AR. at 18.   Inexplicably, he never requested another physical RFC assessment.

. from which the petitioner's RFC can be assessed, an 'obvious gap' exists and the ALJ is obligated to further develop the record." (citing Iacobucci v. Commissioner, No. 14-CV-1260, 2015 WL 4038551, at *4-5 (W.D.N.Y. June 30, 2015)). Moreover, the ALJ's failure to adequately assess the findings unnecessarily frustrates this Court's process of review and plaintiff's ability to understand the disposition. See Halloran, 362 F.3d at 32-33.

While the ALJ does address the differences between Dr. Lewis' and Dr. Leone's findings, he does so only in an attempt to draw attention to the fact that Dr. Lewis and Dr. Leone disagree as to what part of plaintiff's back was causing her disabling pain.[4] Like Dr. Lewis, Dr. Leone found that plaintiff's back pain was so severe as to be disabling. See AR. at 19. Yet, the ALJ made no attempt to properly assess Dr. Lewis' opinion that plaintiff was "very disabled" and suffering from "severe pain" untreatable with medication and Dr. Leone's opinion that plaintiff was in chronic pain and unable to attend school for four months. AR. at 332, 432, 481-82. In dismissing Dr. Lewis' and Dr. Leone's findings regarding the severity of plaintiff's pain and her inability to attend her

---

[4] Here, two treating specialists agree that plaintiff had back pain severe enough to prevent her from employment, but disagree as to the specific cause of that pain. It is the existence of the pain and not the cause of the pain that is most relevant to assessing plaintiff's RFC. It would be improper for the Commissioner or this Court to reject the opinions of Dr. Leone and Dr. Lewis on the severity of plaintiff's back pain simply because they were not in agreement on the exact cause of the pain.

classes, the ALJ did not appropriately apply the treating physician rule. Indeed, aside from what was detailed above, the ALJ provided no comprehensive explanation of the weight he gave to Dr. Lewis' or Dr. Leone's opinion as required by the Second Circuit. Instead, the ALJ relied on Dr. Lewis' statement that plaintiff was "very disabled" as a talismanic incantation that shielded him from meaningfully engaging with the dozens of pages worth of notes on plaintiff's impairments.

2. Opinions of Dr. Totin and Dr. Baskin: Plaintiff next contends that the ALJ failed to properly weigh the opinion of Dr. Totin at step two of the sequential analysis. See Plaintiff's Memorandum (Docket # 9-1) at 12-14. This Court disagrees. Despite plaintiff's insistence otherwise, it seems clear that Dr. Totin's finding that plaintiff experienced one or two repeated episodes of deterioration of extended duration was based on evidence from before the alleged disability onset date. A review of the record (and, importantly, a review of Dr. Totin's opinion) reveals that the only instances of decompensation here occurred in 2006 – when plaintiff was hospitalized for depression – and possibly in 2009 – when plaintiff was enrolled in counseling. AR. at 378. Both occurred well before the 2011 disability onset date.

Plaintiff's related argument that the ALJ failed to properly credit the opinion of Dr. Baskin, which plaintiff believes qualifies her to meet the listing for depressive effective disorders, is

similarly unpersuasive.    Dr. Baskin, unlike Dr. Totin, twice examined plaintiff in-person and offered two separate opinions that she would have "minimal to no limitations being able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions and relate adequately with others." AR. at 210, 346. Though Dr. Baskin noted that plaintiff would have "moderate limitations being able to deal with stress," she reported no episodes of deterioration or decompensation. Id. Additionally, the ALJ found that substantial evidence - particularly plaintiff's schedule, which included attending classes five days a week, maintaining average to above-average grades, driving to and from school, driving her son to and from school, going out to eat, and cooking and caring for both herself and her son - supported a conclusion that plaintiff's mental impairment not only fell short of the listing requirements for an effective disorder, see 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04, but was non-severe in nature.    AR. at 15-16.    Accordingly, I find that the ALJ's determination at step two was supported by substantial evidence.

## Conclusion

The Commissioner's motion for judgment on the pleadings (Docket # 16) is **denied**, and plaintiff's motion for judgment on the pleadings

37

(Docket # 9) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:  May 6, 2016
        Rochester, New York